IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

TERESA BLOOMQUIST,

    Plaintiff,

v.

WALGREENS CO.,

    Defendant.

_____/

**No. C 09-01737 RS**

**ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

Plaintiff Teresa Bloomquist brought this action alleging that defendant Walgreens[1] discriminated against her on the basis of a disability when it terminated her employment. Walgreens contends Bloomquist was terminated for violating company policy prohibiting employees from personally using or consuming store merchandise prior to paying for it, and more specifically for consuming a V8 juice drink she did not purchase. Because Bloomquist has shown a triable issue of fact as to whether Walgreens' stated basis for her termination was pretextual, the

---

[1] The corporation's correct name is singular—Walgreen Co.—but it operates stores under the name "Walgreens."

motion for summary judgment will be denied, except to the extent she is claiming a failure to engage in the interactive process or to accommodate separate and apart from her termination.

## II. BACKGROUND

Bloomquist worked for defendant Walgreens for nearly 26 years, the last two-and-a-half of which in the capacity of a store manager. In October of 2007, Bloomquist took medical leave for knee surgery and subsequent rehabilitation. She returned to work in February of 2008 under a doctor's release that imposed no working condition restrictions, although she contends she was still limping and in some pain.[2] Bloomquist asserts that upon her return from medical leave, she was treated negatively and unfairly by Dan Kidson, a new district manager who had become her supervisor shortly after the injury that led to her need for surgery.

In May of 2008, Bloomquist provided Walgreens with a doctor's note indicating she was not to work more than eight hours a day, and was not to climb ladders. Within a few days, Bloomquist received an unannounced visit from Kidson in which he questioned her regarding her restrictions. According to handwritten notes Bloomquist prepared shortly after her termination, Kidson, "said it is hard to have a store manager with such restriction" and asked her if she "still wanted to be store manager." When Bloomquist said she wanted to continue as store manager, Kidson told her he needed "a revised Dr. Note removing the restrictions."

In opposition to this motion, Bloomquist characterizes that conversation in a similar manner, asserting that Kidson told her she "could not perform the job of Store Manager in 8 hours a day" and asked her if she was going to step down. Bloomquist asserts that the discussion left her feeling as though her job had been threatened.[3]

---

[2] Bloomquist's declaration in opposition to the motion attests that she was under medical restrictions upon her return, citing doctor's notes purportedly attached as Exhibit B to her declaration. As filed, however, Bloomquist's declaration included no such exhibit. Her counsel's declaration includes a doctor's note indicating she was cleared to "return to full duties with no restrictions on 2/17/2008." Waelty Decl. Exh. O.

[3] Walgreens argues that Bloomquist's current declaration should be disregarded because it "contradicts" her earlier handwritten notes memorializing the conversation. On this point, the minor

In early June of 2008, shortly after the conversation between Kidson and Bloomquist regarding her restrictions took place, Walgreen employee Brenda Jenson sent two emails to Kidson reporting instances of possible violations of Walgreens policy by Bloomquist. Jenson had responsibility for assisting branch stores in conducting "re-maps"—reorganizations of the sales floor layout. She had recently been working at Bloomquist's store. One email reported that Bloomquist had left the store unattended to go with two other employees to Starbucks. The other email reported that Bloomquist had taken a package of nail clippers from the shelf, opened it and used it, stating that she would pay for them later. Kidson advised Jenson to forward the information to Debbie Schenkhuizen, a Walgreens Loss Prevention Supervisor.

Schenkhuizen opened an investigation, focusing on allegations that Bloomquist had used band aids and nail clippers prior to paying for them, in contravention of a purported policy against what Walgreen calls "grazing."[4] In the ensuing inquiry, Bloomquist admitted using the band aids and nail clippers prior to paying for them, but was able to establish that she ultimately purchased those items. Bloomquist also admitted consuming a V8 juice drink, however, for which she was not able to produce a receipt, despite her claim that she had also paid for it. Schenkhuizen reviewed the electronic journal cash register transaction logs for a twelve day period, as well as Bloomquist's debit card transaction history to attempt to verify her claim that she had paid for the V8 with her debit card. Schenkhuizen was unable to obtain any "objectively verifiable evidence" of payment.

Schenkhuizen forwarded her findings to Walgreens' Employee Relations department and to Kidson. In consultation with counsel from Employee Relations and a Vice President of Operations,

---

differences in the two descriptions of the conversation do not give rise to a conflict—the gist of the declaration and the notes is the same. Either one provides some evidence that Kidson appeared to believe Bloomquist's medical condition rendered her less than fully capable of performing her job.

[4] Bloomquist denies being aware at any time prior to the investigation that Walgreens considered "grazing" to include opening or using products prior to payment, as opposed to failing ever to pay for consumed items. While it is intuitive that Walgreens might wish to prohibit opening and consuming products prior to payment as a means of avoiding disputes regarding whether an employee *intended* to pay, Bloomquist correctly notes that certain Walgreens employee literature does not clearly advise that the timing of payment is as important as the fact of payment. See Waelty Decl. Exh. Q.

United States District Court
For the Northern District of California

1  Kidson determined Bloomquist should be terminated for theft of the V8 and her admitting "grazing"
2  (within Walgreens' understanding of that term) as to the band aids, the nail clippers, and the V8.
3      In her deposition in this action, Bloomquist maintained that she in fact paid for the V8. Her
4  complaint specifically alleges her possession of just such a receipt. In opposition to this motion,
5  however, Bloomquist declares that she has now reviewed the security video footage from the day in
6  question and has concluded that she was mistaken when she admitted to taking the V8 from
7  Walgreens' stock and consuming it prior to payment. Instead, Bloomquist contends, she brought the
8  V8 into the store when she arrived that day. Bloomquist provides no information as to where or
9  when she believes she acquired the V8, but the implication is that even if it came from her
10  Walgreen's store, the record of her payment was not located because she acquired and paid for the
11  V8 at some earlier point in time.

### III. LEGAL STANDARD

Summary judgment is proper "if the pleadings and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The purpose of summary judgment "is to isolate and dispose of factually unsupported claims or defenses." *Celotex v. Catrett*, 477 U.S. 317, 323-324 (1986).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings and admissions on file, together with the affidavits, if any' which it believes demonstrate the absence of a genuine issue of material fact." *Id*. at 323. If it meets this burden, the moving party is then entitled to judgment as a matter of law when the non-moving party fails to make a sufficient showing on an essential element of his case with respect to which he bears the burden of proof at trial. *Id*. at 322-23.

The non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The non-moving party cannot defeat the moving party's properly supported motion for summary judgment simply by alleging some factual dispute between the

parties. To preclude the entry of summary judgment, the non-moving party must bring forth material facts, i.e., "facts that might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986). The opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 588 (1986). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587.

## IV. DISCUSSION

### A. Plaintiff's *Prima Facie* Case

Walgreens initially contends that Bloomquist has not made out even a *prima facie* case of discrimination because the undisputed facts do not show that she suffered from a disability at the time in question. Indeed, given the evidence that Bloomquist's only medical restrictions were that she not work in excess of 40 hours a week or climb ladders, it is far from clear that she had any condition "that makes the achievement of a major life activity difficult." Cal. Gov. Code §12926(k); see also *DFEH v. Smurfit Corp.,* Dec. No. 98-01, 1997 WL 840033 (Cal. FEHC 1997) (forty hour work week limitation is not "in and of itself, is a limitation of a major life activity or makes achievement unusually difficult.")

Nevertheless, although the question is close, there is some evidence that, if credited by a trier of fact, could support a conclusion that district manager Kidson viewed Bloomquist's medical condition as interfering with her ability to perform her job functions adequately. While Walgreens insists that it accommodated Bloomquist by granting her leave, by never *requiring* her to work in excess of 40 hours a week, and by allowing her to delegate her responsibilities on the infrequent occasions she otherwise would have been required to climb a ladder, a rational trier of fact could

5

infer from Bloomquist's account of her interactions with Kidson that he did not believe she was capable of performing as a store manager in light of her physical condition. The short interval between the time when Kidson allegedly either expressed his opinion that it would be "hard" for Bloomquist to perform or that she "could not perform," and the time when the investigation leading to her termination commenced, is sufficient to support an inference that her perceived disability led to her termination.[5]

### B. Plaintiff's termination

Upon the showing of a *prima facie* case of discrimination, the burden of production shifts to the employer to present sufficient evidence for a fact-finder to conclude the employer had a legitimate, non-discriminatory basis to take the challenged employment action. *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792, 802-803 (1973). Here, Walgreen's has shown that its stated basis for terminating Bloomquist's employment was her admission that she had engaged in conduct that it considers improper "grazing," and its conclusion that in the case of the V8 drink, she had never paid for the item, despite her protestation to the contrary. Bloomquist takes no issue with the proposition that an employee's failure to pay for even a single V8 could supply sufficient grounds for termination. Indeed, other than contending that Walgreens had not previously clearly explained, and she had not understood, that "grazing" included using or consuming items prior to paying for them, Bloomquist similarly does not dispute that a violation of the grazing policy could support a decision to terminate. Although it is certainly possible to imagine Walgreens electing to impose a lesser disciplinary measure under the circumstances, it had no obligation to do so in this at-will employment relationship. Accordingly, Walgreens has met its burden to show a legitimate, non-discriminatory basis for terminating Bloomquist's employment.

---

[5] On reply, Walgreens argues that the Complaint alleges only discrimination based on actual disability and is insufficient to encompass a theory based on perceived disability. The complaint does not plainly limit itself to either theory, and given that California Government Code §12926(k) expressly defines "physical disability" to include actually having a disability *or* being perceived as having one, this argument is not persuasive.

Under the *McDonnell-Douglas* framework, therefore, the burden shifts back to Bloomquist to show the existence of a triable issue of fact that Walgreens' stated basis for the termination was pretextual. Bloomquist offers two basic arguments to show pretext. First, contrary to her prior admissions during the investigation and at deposition, Bloomquist contends that she brought the V8 into the Walgreens on the day in question, rather than taking it from stock, and that Walgreens could and should have discovered that fact through a simple review of store security camera records, had it been interested in conducting a legitimate and fair investigation.

Even assuming that Walgreens *could* have made that determination from the security footage, and even assuming that under these particular circumstances it is appropriate to allow Bloomquist to recant her prior admissions, she has not shown any reason to suggest that Walgreens had an obligation to disregard the admission she made at the time. As Walgreens points out, the question is *not* whether it *correctly* determined that Bloomquist had committed theft. In fact, Walgreens did not even necessarily need to be *reasonable* in arriving at its belief that there was good cause to terminate Bloomquist. *See Guz v. Bechtel National, Inc.*, 24 Cal.4th 317, 358 (2000) ("proffered reasons, if nondiscriminatory on their face and honestly believed by employer, will suffice even if foolish or trivial or baseless." (citations omitted)).[6] Given the fact that Bloomquist, at no time prior to filing her opposition to the present motion, ever suggested that the V8 originated from anywhere other than the store's shelves, Walgreens simply cannot be faulted for not analyzing the security video more closely. Any failure to do so, therefore, is not sufficient to create a triable issue of fact as to pretext.

Bloomquist, however, also disputes Walgreens' contention that the investigation into her alleged misconduct was instigated and carried out independently of the discriminatory animus that she claims was exhibited by Kidson. Bloomquist cites *Reeves v. Safeway Stores, Inc.*, 121 Cal.App.4th 95 (Cal. App. 2004) for the proposition that a plaintiff need not show discriminatory animus on the part of *all* the corporate decision-makers involved in the matter, but only that "animus

---

[6] The objective soundness of an employer's proffered reasons, however, may be relevant to their credibility. *Guz*, 24 Cal. 4th at 358.

1  on the part of one or more contributors to the decision was a substantial contributing factor in
2  bringing about [plaintiff's] dismissal." 121 Cal. App. 4th at 113.  Referring to an Aesop's fable cited
3  in *Reeves*, Bloomquist argues that liability arises if Kidson used others in the organization as his
4  "cat's paw" to carry out indirectly her termination.

5  Walgreens argues that *Reeves* is wholly inapplicable here, as there was no claim in *Reeves*
6  that the persons who made the termination decision had any discriminatory animus, but only that the
7  person who instigated the investigation into the plaintiffs' conduct did.[7]  This case presents the
8  opposite situation, Walgreens contends, because no animus has been ascribed to Brenda Jenson,
9  whose complaints about Bloomquist gave rise to the investigation, or to Debbie Schenkhuizen, who
10 carried it out.   While that may be true, Walgreens is being too dismissive of the fact that Kidson
11 undisputedly *did* participate in the final termination decision.

12 Even if Kidson had no part in instigating or conducting the investigation, he appears to have
13 played an important role in deciding what the consequences to Bloomquist would be.  Walgreens
14 has not established, or even argued, that it *always* terminates employees when it concludes they
15 have engaged in conduct like that for which Bloomquist was terminated. It is reasonable to infer that
16 the decision-making group exercised some discretion in handling the situation, and it further appears
17 that as a district manager and Bloomquist's direct supervisor, Kidson was in position to exercise
18 significant influence in how that discretion was exercised.  Therefore, Bloomquist properly relies on
19 *Reeves* for the proposition that Kidson's purported animus may support liability if it was "a
20 substantial contributing factor in bringing about [plaintiff's] dismissal."

21 The Court's comments at the hearing on this motion reflect the fact that Bloomquist's case
22 appears to be resting on a series of very thin reeds.  Nevertheless, upon review of the entire present
23 record in the light most favorable to plaintiff, the Court is not convinced that it would be irrational
24 for a trier of fact to conclude Kidson held a discriminatory animus that substantially contributed to
25 Bloomquist's termination.

---

[7] Or, more precisely, there was a triable issue of fact as to whether that person had discriminatory animus.

### C. Interactive process, accommodation

Bloomquist's complaint includes counts based on Walgreens' alleged failure to accommodate her disability or to engage in the interactive process. To the extent these claims are based on the fact that she was terminated, they survive, but add nothing of substance to her primary claims of discrimination and wrongful termination. It appears from her opposition, however, that Bloomquist is claiming that Walgreens failed to engage in the interactive process or to accommodate her disability in the months *prior* to her termination. Her cursory and conclusory arguments in this regard are insufficient to create a triable issue of fact in light of the undisputed evidence that she returned to work under a doctor's note stating she was cleared to return without restrictions and in the absence of any evidence of any requests by her or other circumstances that gave rise to a *sua sponte* duty on Walgreens' part to initiate the interactive process or offer accommodation. Accordingly, partial summary judgment will issue as to the claim that Walgreens failed to accommodate or engage in the interactive process separately separate and apart from the termination itself.[8]

---

[8] For the same reasons set forth above regarding her discrimination claim, Bloomquist's claim for wrongful termination is not subject to summary judgment.

## V. CONCLUSION

Walgreen's motion is granted with respect to Bloomquist's claims that it failed to engage in the interactive process or to accommodate her disability other than in connection with the termination itself. The motion is otherwise denied.

IT IS SO ORDERED.

Dated: 02/05/2010

RICHARD SEEBORG
UNITED STATES DISTRICT JUDGE